John Woolery
4308 Skyline Place
Pittsburg, CA 94565
PH: (9250 822-5273
Email: johndwoolery@gmail.com
Plaintiff Pro Per

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN WOOLERY,<br><br>         Plaintiff,<br><br>   vs.<br><br>SCOTT SMITH (AS AN INDIVIDUAL AND OFFICIAL), GUY SWANGER (AS AN INDIVIDUAL AND OFFICIAL), DAVID GREENFIELD( AS AN OFFICIAL AND INDIVIDUAL), CONTRA COSTA COUNTY<br><br>        Defendants. | Case No. 3:17-cv-06786-SK<br><br>Assigned to the Honorable Judge Sallie Kim<br>Date Action Filed:  November 27, 2017<br>Trial Date:         April 30, 2019<br><br><br>**SECOND AMENDED COMPLAINT**<br>  **A.** BANE ACT (CIV CODE, §52.1)<br>  **B.** U.S. 8TH AMENDMENT VIOLATION<br>  **C.** BREACH OF DUTY OF CARE (GOV. CODE, § 845.6) CALIFORNIA<br>  **D.** GOVERNMENT CODE § 845.6 FOR FAILURE TO SUMMON MEDICAL CARE<br>  **E.** U.S. 14TH AMENDMENT VIOLATION<br>  **F.** INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS<br>  **G.** VIOLATION OF 42 U.S.C. § 1983<br><br><br>**DEMAND FOR JURY TRIAL** |

Dated: April 4, 2018

By: John Woolery
Plaintiff Pro Per

## INTRODUCTION

This is a civil rights action requesting declaratory and injunctive relief and monetary damages from the Defendants Contra Costa County (COUNTY), Scott Smith, Guy Swanger and David Greenfield for depriving the plaintiff, John Woolery, of his California Constitutional rights and U.S. Constitutional rights. Plaintiff seeks monetary damages for the depravation of rights the he suffered.

## THE PARTIES

A.  Defendant COUNTY is responsible for the policy of MDF, staffing of MDF, training of

- 1 -

1    personnel of MDF and the supervision of MDF.

2      B.  Defendant Scott Smith and David Greenfield are both City of Concord Police

3          Department Detectives

4      C.  Upon information and belief, each of the Defendants performed, participated in, aided

5          and/or abetted, or were deliberately indifferent to the acts averred herein, proximately

6          caused the damages averred below and are liable for the damages and other relief sought

7          herein.

8      D.  Upon information and belief, all of the actions alleged in this Second Amended

9          Complaint (SAC) against the COUNTY were taken pursuant to customs, polices, and

10         practices of the County and the Defendant COUNTY have been, are presently and will

11         be acting under the color and authority of the laws of the United States and the State of

12         California.

**FACTUAL ALLEGATIONS**

On the afternoon of February 10, 2017 the plaintiff was released from custody on $150,000 bail and left the Concord Jail. On the evening of February 10, 2017 Defendant Scott Smith took the Plaintiff's keys from the Plaintiff to restrict the Plaintiff from accessing his vehicle and belongings. Plaintiff was not in custody and Plaintiff's vehicle had not been seized.  Concord Police officers called Detective Smith several times in an effort to get Plaintiff's vehicle and house keys back but failed to get a response. Concord Police Department secretary called Defendant Smith to request his return with no response. Amanda from Aladdin bail bonds called the Defendant to retrieve the keys as well with no response.  Plaintiff's medications and personal belongings were in his vehicle and he was still due to take these medications. Concord Police personnel informed Detective Smith that Plaintiff needed those medications and that there was no replacement for those medications since it was now 8:00pm. Defendant Smith refused to return the keys nonetheless. At approximately 10:30pm while waiting for Defendant Smith to return with the Plaintiff's keys, without access to his belongings, phone, money, vehicle or medications Plaintiff was found unresponsive by paramedics and was admitted to the hospital for 5 days and life support for 2 days.

Based on investigation results that began on February 10, 2017, on March 30, 2017 Plaintiff was

- 2 -

charged with stalking.  As part of the investigation Concord Police Detectives created several documents that contained untrue and false statements including but not limited police report #1705506 and a bail declaration dated March 30, 2017. On March 30, 2017 Defendant Scott Smith submitted a declaration to the magistrate judge of the superior court in support of increasing Plaintiff's bail (Exhibit A).  Due to the increase in Bail from $150,000 to $1,000,000 Plaintiff was arrested again on March 30, 2017 and taken into custody. In the declaration submitted under penalty perjury to the magistrate judge Defendant Smith made several statements that were untrue and false.

On June 27, 2017 Plaintiff plead "no contest" to the charge of stalking, and remains on probation until June 27, 2020.

On July 5, 2017 Plaintiff was denied Alternative Sentencing based on the review of the Defendant Scott Smith's untrue and false testimony and was taken into custody on July 5, 2017and served 75 days in jail.  Plaintiff during this time lost his, job, lost his familial rights, lost his business and lost his vehicle and his health was destroyed.

On July 5th per the protocol of the MDF Plaintiff went through inmate intake and was interviewed by MDF Medical Staff about existing medications and medical problems.  From July 5, 2017- July 7th Plaintiff was held in a holding cell with 22 other inmates due to MDF's overcrowding and the lack of available housing for inmates.

On July 7, 2017 after being in MDF for only 2 days Plaintiff submitted a written request for a medication adjustment due to medical complications he was experiencing.  On July 8, 2017 the Plaintiff made a second request for a Medication Adjustment from the on duty nurse. On July 8th Plaintiff was refused his Atenolol, Amlodipine, Gabapentin and Cholesterol medications because Plaintiff refused to take the medication Lamictal. Plaintiff felt he was having a negative reaction to Lamictal.

On July 7, 2017 and July 8, 2017 Plaintiff was threatened and told that he needed to "take all of the medications or you will get none". Accordingly, Plaintiff placed a verbal complaint with Deputy Boutian and a written complaint to the director of the Medical staff as directed by the on charge Deputy

On July 8, 2017 Plaintiff was experiencing headaches, leg pain, chest pain and eye floaters. Plaintiff after only a few days voiced his concerns to medical staff and deputies of his suffering but no action was taken. Plaintiff has a history of stroke, hypertension heart disease and felt the deprivation of

medications was life threatening and he voiced his concerns on written forms and to staff. Plaintiff's requests all went ignored. After 3 days of threats from multiple nurses at MDF and no response from the on duty deputies and from his Medical grievance Plaintiff was resigned to take all medications because of the catastrophic of fear of not receiving his medications that were essential to life.

On July 10, 2017 Plaintiff informed Deputy Ball that he was experiencing headaches, fever, sore throat and syncope.  On July 11, 2017, Plaintiff made his 3rd and 4th request for sterile CPAP water for his Obstructive Sleep Apnea a requirement for this equipment and his health. Plaintiff was experiencing: Congestion, Runny nose, nose bleeds, Sneezing and a sore throat, syncope and higher blood pressure. Plaintiff's began to deteriorate and by July 11, 2017 had notified the on call nurse, had requested to see a physician and had now placed 4 written requests for help. On July 11, 2017 Deputy Powell was given a verbal complaint in regards to dizziness, headaches and vision issues by Plaintiff.

On July 12, 2017, Plaintiff requested to meet with a doctor with no response.  On July 12th the Nurse Practitioner noted she would adjust the Plaintiff's medications and notify the nursing staff but as of July 13th the medical staff was still non-compliant. On July 13, 2017 Deputy Ball was told by Plaintiff that Nurses were continually refusing all medications because Plaintiff didn't want to take Lamictal. Plaintiff also on July 13, 2017 placed a grievance for the second time to the on duty Sheriff in charge in a plea to get medical attention.  Due to threats of not being provided all of Plaintiff's medication Plaintiff continued to take the Lamictal.

On July 13, 2017, a second request was put in pleading with staff to adjust medications because Plaintiff was threatened again "all medications or no medications" when he tried again to refuse the medication Lamictal. On July 14, 2017, Plaintiff was refused Blood Pressure medications again because Plaintiff refused to take Lamictal.  Plaintiff has a history of stroke, blood clots, atrial fibrillation, syncope and high blood pressure and therefore these medications prescribed by Plaintiff's primary care physician were clearly necessary to survive.

On July 15, 2017, Plaintiff requested medical help because he suspected he was having a second stroke. Melvin Whitfield contacted the on-duty deputy (Garcia) and Garcia stated to Plaintiff, "help? Do you know where you are?" Closed the door and left. On July 15, 2017 Nurse Temicla in a written request was made aware of Plaintiff's medical concerns and Nurse Tanya's refusal to provide Plaintiff

- 4 -

his blood pressure medication. Plaintiff told Deputy Ball that he was experiencing headaches and syncope. However, no action was taken.

On July 26, 2017, Plaintiff requested another "psychiatric" medication adjustment and was told a doctor would come to see him. No Medication Adjustment, no Neurontin/Gabapentin was provided, and no Blood Pressure medications were provided. On this day Plaintiff also informed Deputy Snyder that he was experiencing unusual emotional swings and a rash that he thought was due to the Lamictal. Deputy Snyder, stated, "use the triage system and place a written request". Plaintiff complied and no action was taken.

On July 28, 2017 the Psychiatrist came to see Plaintiff and discuss Plaintiff's medications, however due to the Friday module inspection Deputy Maka stated the physician would have to return later since the module was on 24-hour lock down so the workers could clean. Medications were not changed and his health worsened. Later, no Neurontin/Gabapentin was provided, and no Blood Pressure medications were provided because, "Unit is out and Pharmacy is closed". Plaintiff's headaches were now becoming daily and pain was becoming intolerable.

On August 3, 2017, Plaintiff requested a medication adjustment again and referred medical staff to his physician to contact. Plaintiff received a response from his constant request for medical help that simply stated, "Scheduled". Plaintiff was now experiencing eye floaters, eyes that appeared yellowish (jaundice), Itchy skin, dark urine color, Pale stool color, bloody tar-colored stool, eye cysts and repeating eye lesions. In addition on August 3, 2017 Deputy Schwaab was told by Plaintiff that he was experiencing unusual anxiety and depression which he thought was due to the medications and then Nurse Victoria was notified of Plaintiff's unusual anxiety and vision issues. Plaintiff was developing a severe visible rash that he spoke to the Nurse Triage system about. On August 14, 2017 Nurse Harji was notified by plaintiff that his rash was intensifying.

On August 26, Plaintiff was experiencing leg swelling and a severe rash was developing. August 26, 2017 a verbal complaint was made to Deputy Sevier in regards to blurred vision and rash. Plaintiff showed his rash to Deputy Snyder and requested help with no response. August 29, 2017 a verbal complaint was made to Deputy Stokes in regards to plaintiff's rash and Plaintiff called the nurse triage system to ask for help.

On the evening of August 29, 2017 Nurse John was made aware of Plaintiff's rash again and request to see a doctor. However, no action was taken.  On August 29, 2017, Plaintiff requested to see a doctor again and was now having pain on his left side, numbness on his left side, severe swelling in his face and throat. Plaintiff's skin was beginning to detach, and some areas were open and bleeding. The rash was everywhere including his rectum and eyes and the pain was excoriating. The plaintiff used all procedures and remedies expressed to him by staff. Plaintiff's verbal and written submitted requests and grievances to medical staff, deputies and staff regarding his medical care without any action was taken by over 17 Martinez Detention Facility Personnel.

On August 30, 2017 Plaintiff spoke to Nurse Baciler and informed the nurse of eye floaters, kidney pain and fever. No action was taken.

September 7, 2017, another inmate called for the on-duty deputy because he said Plaintiff was laboring breathing and his face looked like a "sick carved jack-o-lantern". Plaintiff couldn't walk (5) steps without laboring, was having trouble breathing and on duty personnel called the paramedics and he was admitted to the County Hospital. Upon admission Physicians originally stated, has the appearance of a late stage AIDS patient" (Exhibit B). Later on September 7, 2017 Plaintiff was diagnosed with DRESS syndrome due to a reaction to Lamictal a medication that the Staff at Martinez Detention forced him to take by threats and then did not monitor his reaction to it after he clearly asked for help.  Since release from the Martinez Detention Facility Plaintiff has returned the Emergency room on 3 occasions due to DRESS symptoms of rash, lymph node swelling and possible organ damage.

**A. 1ST CLAIM OF RELIEF- 8TH AMENDMENT VIOLATION AGAINST DEFENDANT SCOTT SMITH FOR EXCESSIVE BAIL AND CRUEL AND UNUSUAL PUNISHMENT, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

The leading case from all Federal Court circuits appears to be Galen v. County of Los Angeles, 477 F.3d 652 (9th Cir. 2007). There, the Ninth Circuit examined the limited Supreme Court precedent on point, and concluded:

**To determine whether the Excessive Bail Clause has been violated, we look to the valid state interests bail is intended to serve for a particular individual and judge whether bail conditions are excessive for the purpose of achieving those interests. The state may not set bail to achieve invalid interests, see Stack [v. Boyle, 342 U.S. 1, 5 (1951)]; Wagenmann v. Adams, 829 F.2d 196, 213 (1st Cir.1987) (affirming a finding of excessive bail where the facts established the state had**

**no legitimate interest in setting bail at a level designed to prevent an arrestee from posting bail), nor in an amount that is excessive in relation to the valid interests it seeks to achieve, see [United States. v.] Salerno, 481 U.S. [739, 754 (1987)].Galen, 477 F.3d at 660.**

The court went on to conclude that a claim must satisfy one of two alternative tests: "[t]o prevail on his claim that his bail enhancement violated the Excessive Bail Clause, Galen must show that the Commissioner enhanced his bail for purposes unauthorized by California law or that the amount of bail was excessive in light of the valid purposes for which it was set." the Galen court added one further hurdle. Because tort principles apply to § 1983 claims, and because judicial officers have long been held to be superseding causes that break the chain of proximate causation, an excessive-bail claim can only succeed where the defendants "deliberately or recklessly misled the [judicial officer who set bail]".

On motions to dismiss, courts have consistently followed the Galen court's lead, requiring complaints to allege facts showing (1) that one of the two tests is satisfied, and also (2) that the defendants' improper conduct proximately interfered with the state court's independent judgment in setting bail. See, e.g., Olajide v. Arsanis, 2014 WL 985102, at *7 (N.D. Cal. Mar. 7, 2014) 2013 WL 655164, at *13–14 (E.D. Cal. Feb. 21, 2013) (dismissing claim because $80,000 bail could not have been excessive in light of bail schedule calling for $75,000); Daoud v. Manchester Police Dep't, 2011 WL 5837126, at *3–4 (D. N.H. Oct. 25, 2011) (dismissing claim that failed to provide allegations as to any of the various state-law factors bearing on flight risk); Muhammad v. San Diego County Sheriff's Dep't, 2008 WL 821832, at *2 (S.D. Cal. Mar. 26, 2008) (dismissing claim with no allegations from which the court could judge whether the defendants had interfered with the state court's independent judgment in setting bail).

That being said, on the March 30th declaration (Exhibit A) that Defendant Scott Smith prepared in accordance with Penal Code Section 1269c, Defendant Smith states, several untrue, misleading statements that deliberately prevented the Magistrate to make an independent accurate decision. Defendant Scott Smith, the Defendant makes numerous erroneous and untrue statements including but not limited to:

"**During an interview, John Woolery admitted to me that he is bi-polar and has homicidal hallucinations, delusions of grandeur, depression and that he suffers from panic attacks.**"

Detective also goes on to falsely state:

"**He sent photographs of the victim's vehicle and at her daughter's school to prove he was following her**".

- 7 -

Defendant went on to falsely state:

**"He left items at the victim's door"**

Defendant also made the following untrue statement:

**"John Woolery specifically told me that he intended to solicit strange men to follow and her harass her".**

Defendant also falsely states that the Plaintiff "sent text messages" to his ex-wife, he also falsely stated,

**"Woolery requested strange men to follow her".**

Furthermore, Defendant Smith stated on March 30, 2017 that the Plaintiff created "multiple Craigslist advertisements" which is untrue. Detective Smith further included a list of searches that were not accurate including the following;

**"Cost to hire a hitman"** and **"How to find a hitman on craigslist"** and **"murder for hire".**

Additionally Defendant Smith used police report #17-01290 as collaborative evidence for the bail declaration and stated 3 false, untrue, inaccurate craigslist advertisements. The advertisements in Police Report #17-01290 are not accurate, are untrue and were not posted as stated by Defendant Scott Smith.

All conversations between Concord Police Department detectives and the Plaintiff were recorded. After review and transcription none of the before mentioned statements were made and all of the before mentioned statements and quotes are untrue and presented for the sole purpose to mislead the Magistrate judge who decided bail. Based on the precedent established by Galen and decisions that followed Galen the Plaintiff's bail was excessive according to the County of Contra Costa Bail schedule (Exhibit D). The Bail schedule established for the crime alleged is set for a maximum of $150,000 and the bail of $1,000,000 is over 6 times the approved established amount.

Due to the untrue, Bail declaration dated March 30, 2017 Plaintiff was arrested again on March 30, 2017. Plaintiff spent 5 days in jail after the untrue bail declaration was submitted on March 30, 2017. At the Plaintiff's Bail hearing on April 3, 2017 Defendant Scott Smith presented to Judge Laettner an edited doctored, untrue copy of the original declaration signed on March 30, 2017 (See Exhibit F). Once again this action was done to deliberately mislead Judge Laettner, Plaintiff's Counsel and the District Attorney in court to unconstitutionally keep the bail at $1,000,000. Plaintiff was not a flight risk, there was no criminal record and Plaintiff was due in court in 3 days with no new evidence

established or collected since the original bail was set on February 10, 2017.  Plaintiff was a homeowner and business owner with strong ties to the community.   Defendant Scott Smith deliberately and recklessly mislead the Magistrate Judge who set bail on March 30, 2017 and then again a second Judge on April 3, 2017 when he presented an amended edited version of the declaration to Judge Laettner to mislead Judge Laettner and violate the Plaintiff's Constitutional rights.   The court in Jones v. City of Chicago 856 F. 2d 985 used this standard:

**"[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial -none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.... If police officers have been instrumental in the plaintiffs continued confinement or prosecution, they cannot escape liability by pointing to the decisions of [others] to confine or prosecute him. They cannot hide behind the officials whom they have defrauded. "When the police fabricate evidence, they are clearly defrauding, misleading, and deceiving everyone involved in the criminal process. Any decision made by a prosecutor, judge, grand jury, or jury will be tainted".**

In constitutional-tort cases as in other cases, "a man [is] responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961). This principle led the Supreme Court in Malley v. Briggs, 475 U.S. 335, 106 S. Ct. 1092, 89 L.Ed.2d 271 (1986), to hold that the issuance of an arrest warrant will not shield the police officer who applied for the warrant from liability for false arrest if "a reasonably well-trained officer in [his] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." Id. at 345, 106 S.Ct. at 1098 (footnote omitted). The Court was speaking of immunity but its discussion is equally relevant to causation, as indeed is implied in a footnote to the Court's opinion. See id. at 344 n. 7, 106 S.Ct. at 1098 n.7. By parallel reasoning, a prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial--none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision. See, e.g., Myers v. Morris, 810 F.2d 1437, 1457 (8th Cir.1987); Hand v. Gary, supra; Smiddy v. Varney, 665 F.2d 261, 266-67 (9th Cir.1981); Dellums v. Powell, supra, 566 F.2d at 192-94; Ames v. United States, 600 F.2d 183, 185 (8th Cir.1979) (dictum); cf. McLaughlin v. Alban, 775 F.2d 389 (D.C.Cir.1985) (per curiam).

**B.   2ND CLAIM OF RELIEF PLAINTIFF – U.S. CONSTITUTION 8TH AMENDMENT CLAIM AGAINST DEFENDANT CONTRA COSTA COUNTY FOR CRUEL AND**

1

2

**UNUSUAL PUNISHMENT-/DELIBERATE INDIFFERENCE – MONNELL CLAIM/MUNICIPAL LIABILITY**

3

In order to establish municipal liability, Monnell v. Department of Social Services, 436 U.S.

4

658, 691-92, 694 (9178), held that a plaintiff must identify "a government's policy or custom" that

5

caused the injury. In later cases, the Supreme Court required a plaintiff to show that the policy was

6

enacted or maintained with deliberate indifference to an almost inevitable constitutional injury. See City

7

of Canton v. Harris, 489 U.S. 378, 389 (1989). The Court has long recognized that supervisory liability

8

is critical to preserving the core purpose of § 1983, namely to "protect the people from unconstitutional

9

action under color of state law," both by deterring wrongdoing and by providing a remedy for those

10

injured by such conduct. City of Canton v. Harris, 489 U.S. 378, 388 (1989). Owen v. City of

11

Independence, 445 U.S. 622, 651 (1980); Mitchum v. Foster, 407 U.S. 225, 242 (1972). The Supreme

12

Court has held that causation under § 1983 exists if a municipality or one of its policymakers adopts a

policy or practice that, although not itself unlawful, is the "moving force of the constitutional violation."

13

For more than 5 years Contra Costa County has instituted a policy of deliberate indifference to

14

the safety of the population of MDF. In an investigation conducted by Contra Costa County in 2015 it

15

was found that since MDF went to a double occupancy policy that the average daily population of MDF

16

has become "extremely troubling" and that MDF runs "chronically above functional capacity".

17

Typically a jail's functional capacity is defined as 85% of a jail's rated capacity. "When the population

18

crosses the 85% threshold, a facility will have difficulty safely housing its residents" as reported by

19

Contra Costa County in 2015. The report goes on to state, "As a result to overcrowding the safety,

20

staffing and security of residents and staff alike are compromised". What is more troubling is at times

21

not only does MDF run over the jail's rated capacity it often runs over its functional capacity placing

22

the jail population, and personnel all at "great risk". Staffing when running a jail over capacity becomes

23

a habitual problem placing the entire population at risk. In yet another report it was found, "The facility's

24

overcrowding results in chronic maintenance problems, especially to the entire plumbing system, the

25

deficiencies of which interfere with both health safety, despite ongoing repairs and upgrades over the

26

years". Furthermore, in 2015 and 2016 MDF was not only run over its rated capacity but ran at over

27

100% capacity on numerous occasions with no rectification by the Defendants.

28

MDF currently operates at or over capacity and uses double bunked cells which places inmates

- 10 -

in unsafe, unsecure, inhumane environments. Since at least 2015 the policy of Defendant COUNTY and MDF has been a policy that poses risk of safety, poor supervision and non-compliance of Title 24. Contra Costa County has a failed policy which doesn't allow personnel at MDF to properly supervise, properly train, properly staff or supervise personnel properly. Due to persistent overcrowding, poor sightlines and an inadequate training system inmate's health, safety and security is placed at risk daily. Due to this failed policy the Plaintiff suffered damages.

Defendant COUNTY was made aware of MDF's deficiencies maintained a policy acquiescent to overcrowding and deliberate indifference to the safety of the population of MDF.  In 2015 Sheriff David Livingston, Undersheriff Michael Castgen, Assistant Sheriff Mathew Schuler, Captain Thomas Clark, Lieutenant Brain Bonthron, Detention Mental Health Supervisor Candace Kunz-Tao, Director of Education Lindy Khan and over 23 other directors, administrators  and principals within Contra Costa County assisted, funded and helped create the HDR report (Exhibit E) that provided the necessary recommendations for MDF to meet Title 24 regulations, meet health standards, inmate safety standards and provide a safe environment for the population of MDF. According to the HDR report generated with the help MDF personnel, Contra Costa County and Contra Costa County personnel it was found that due to MDF's current rated capacity,

**"People incarcerated at MDF experience extremely long periods of confinement in their cells, which is inconsistent with either safety or rehabilitation."**

The HDR report goes on to state,

**"When built, MDF was a state-of-the-art direct supervision facility in both physical plant and operational philosophy. However, because the increases in its BSCC-rated capacity in the last 30 years have led to chronic double-bunking and overcrowding, the tenets of direct supervision cannot be maintained, compromising the safety and security of residents and staff, as demonstrated by high rates of assaults at the facility. Returning the housing unit capacities to 48 beds as originally designed will improve safety and security at MDF. In addition, reducing the overcrowded conditions will improve and enhance the effectiveness of any new programming introduced at the facility."**

Page 40 the Jail Needs Assessment Report from goes on to state,

**"These conditions – compacted, under-designed, overly restrictive, populated by the highest-need individuals whose mental health conditions are exacerbated by deleterious living conditions, nearly <u>devoid of appropriate services</u>, with population levels <u>inconsistent with direct supervision</u>**

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

1

**design – pose serious and constant risks to the safe, secure, humane, and effective operations at MDF. "**

2

In another report created by Contra Costa County in 2016 it was found,

3

4

**"As a result of this "overcrowding and limited access to programming, people incarcerated at MDF – including those with the most complex and urgent health needs – live in the most restrictive, most dangerous, and least rehabilitative, conditions of the entire County jail system."**

5

6

The report goes on to state that MDF staff is not properly trained or supervised and that a staff training

7

protocol moving forward to ensure safety for the population should include,

8

9

**"Biweekly team meetings will include the program staff and relevant partners who are also serving these clients. In addition, the program will conduct regular meetings, no less than monthly, to discuss program implementation, adherence to treatment protocol/curriculum, barriers to be overcome for highest level of participation, and treatment attendance and compliance. This inclusive, Multi-Disciplinary Team (MDT) approach will ensure that clients receive holistic, integrated, efficient, and effective services customized to their individual needs."**

10

11

12

13

Defendant COUNTY and Sheriff David Livingston have taken a position of deliberate indifference to

14

the needs of the population of MDF. MDF's overcrowding has caused; understaffing, poor training,

15

poor supervision, unsafe, and unhealthy environment that led to the unconstitutional treatment of the

16

Plaintiff.  While incarcerated in MDF personnel refused to act on the Plaintiff's requests for help on

17

over 17 occasions in a written and verbal forms (Exhibit C).  Medications that had been prescribed to

18

the Plaintiff by his physician were intentionally denied the Plaintiff on over 5 occasions due to poor

19

staffing, overcrowding and poor training protocol. Plaintiff was actually denied his medications over a

20

weekend because the pharmacy was closed and staff had not prepared for the weekend.  Plaintiff

21

expressed to 14 individuals complaints of headaches, vision deficits, insomnia, chest pain, nausea,

22

lesions, rash, limb numbness pain and burning sensations. Plaintiff complained to 5 individuals more

23

than once that he was experiencing pain, suffering and what he felt life changing health conditions.

24

Supervisors of MDF were notified of the Plaintiff's health deterioration and his requests for medical

25

help yet no action was taken. Due to the deliberate indifference to the medical needs, poor training,

26

overcrowding, poor supervision and poor sightlines the Plaintiff now suffers from non-alcoholic fatty

27

liver, kidney disease, anxiety, scaring and depression. Since the Plaintiff's release from MDF Plaintiff

28

has undergone surgery to remove lesions from the infliction of DRESS, has physical scarring, has been

diagnosed with a nonalcoholic fatty liver and is suffering from severe Kidney dysfunction.

Lewis v. McLean, 864 F.3d 556 (7th Cir. 2017). . "A delay in treatment may show deliberate indifference if it exacerbated the inmate's injury or unnecessarily prolonged his pain," the appellate court wrote, citing precedent, and "even brief, unexplained delays in treatment may constitute deliberate indifference." If Martinez Detention Facility employees and personnel would have acted on Plaintiff's request for help he would have never suffered to the degree he suffered and would not be experiencing Kidney Dysfunction currently due to DRESS. Lesions and cysts developed over 3 weeks after Plaintiff's initial complaints.

Plaintiff complained of physical complaints in written and verbal form to over 15 MDF personnel and provided clear indication of what the Plaintiff was experiencing. Proper training and appropriate staffing would allow for MDF to staff to appropriately asses inmates needs in crisis. The Plaintiff was experiencing a drug reaction that was in concordance with the medication prescribing precautions. However, MDF staff did not have the bandwidth to safely manage the Plaintiff's indications, or supervise the Plaintiff safely.  The prescribing precautions and warnings on every box of Lamictal per Glaxo Smith Kline the manufacturer clearly states (Exhibit G),

 **"At first sign of any skin rash, no matter how mild contact a physician."**

The manufacturer goes on to state,

**"Get emergency medical help if you have any signs of an allergic reaction to Lamictal: hives, fever, swollen glands, and painful sores in and around eyes mouth, difficulty breathing, and swelling of face, lips, tongue or throat."**

MDF personnel due to a lack of medical programming and employee understaffing refused to act and ignored the Plaintiff's suffering and was deliberately indifferent to his requests.

Clement v. Gomez 298 F.3d 898 (9th Cir. 2002) held that, when a medical issue which goes untreated could result in further injury or unnecessary and/or wanton infliction of pain, then the failure to treat the medical condition qualifies as an excessive risk of harm. Plaintiff's medical issues went untreated and ignored for over 60 days due to overcrowding, poor supervision, understaffing and poor training. MDF Medical staff due to understaffing and overcrowding do not have time to review medical requests for several days which consistently delays medical treatment. This delay in treatment

- 13 -

1    caused the Plaintiff severe harm, pain, suffering that is still ongoing and life changing.

2         The next step in determining whether an official has been deliberately indifferent is to determine

3    whether that official had knowledge of the risk of harm to the inmate.  Since 2005 the Defendant the

4    COUNTY has known of MDF's "unsafe environment "for MDF's population. In determining

5    Deliberate Indifferent and Knowledge of Risk, Plaintiff may prove knowledge based on the obviousness

6    of the surrounding circumstances.  Farmer v Brennan.  Lolli v. County of Orange, 351 F.3d 410 (9th

7    Cir. 2003), holding that, where a diabetic was clearly suffering from his condition, prison officials

8    should have been aware from the facts presented that the inmate was at a substantial risk of harm.

9    Medical Staff and deputies were not only told of the Plaintiff's pain and suffering but they could see the

10   suffering due to the fact he had the appearance of a "late stage AIDs patient" (Exhibit D).  Plaintiff's

11   skin was detaching and Plaintiff was disfigured with a full body rash. MDF personnel were made aware

12   of the plaintiff's pain and suffering based on verbal and written complaints by plaintiff. MDF personnel

13   due to poor training and overcrowding did provide medical care to the Plaintiff.

14        The final prong of the deliberate indifference test requires the court to determine if there has

15   been a conscious disregard to the risk of harm a Plaintiff claims.  Conscious disregard requires an

16   official to act or fail to act (whichever may be the case), despite having knowledge of the risk of harm

17   presented.  McGuckin v. Smith, 974 F.2d 1050 (9th Cir. 1992) (holding that officials are culpable if

18   they ignore or fail to respond to an inmates medical needs).  There must be some conscious choice to

19   either act in a manner which will negatively affect the inmate, or to not act such that an inmate is left to

20   peril.   After being notified of the safety issues of MDF for the population the COUNTY has failed to

21   rectify the overcrowding, training deficiencies and staffing issues. From July 8, 2017 through September

22   9, 2017 the Plaintiff placed over 17 verbal and written requests for medical help. In addition, the Plaintiff

23   expressed fears of his safety and substantial risks to his health in 2 written grievances to MDF policy

24   makers, staff, 7 triage calls to medical personnel and 12 formal written requests to on duty deputies.  On

25   August 14, 2017 Plaintiff's skin was beginning to detach from his body and he was bleeding and he

26   notified medical staff and on duty deputies and no action was taken.

27        It is further found that an Eighth Amendment claimant need not show that a prison official acted,

28   or failed to act, believing that harm actually would befall an inmate; it is enough that the official acted,

- 14 -

or failed to act, despite his knowledge of a substantial risk of serious harm. Farmer, 114 S. Ct. at 1981; see Hare, 74 F.3d at 648-50. It is clear that many of the Deputies are poorly trained and did not intentionally force the plaintiff to suffer but based on Farmer defendants failing to act with knowledge of the possibility of substantial risk is a violation of the 8th Amendment.

Furthermore, "intentionally refusing to respond to an inmate's complaints has been acknowledged as constituting deliberate indifference". [Gutierrez v. Peters, 111 F.3d 1364, 1366 (7th Cir. Ill. 1997)]. Plaintiff made requests to Deputies, Sergeants, Physicians, Nurses via the triage system, written grievances and verbally and no action was taken. The personnel intentionally chose to ignore the Plaintiff's suffering based on a lack of training, overcrowding and poor supervision.   The Eighth Circuit Court of Appeals held that a prisoner's claim of being denied medication, or not given prescribed treatment, states a claim under the Eighth Amendment Willie Munn, Appellant, v. Rick Toney, Warden, Varner Unit, Adc; Gates, Security Guard, Varner Unit, Adc; Lt. Bass, Varner Unit, Adc, Appellees, 433 F.3d 1087 (8th Cir. 2006). The appellate court found similarly for Raymond King, King v. Busby, 162 Fed. Appx. 669 (8th Cir. 2006).

C. ~~3<u>RD</u> CLAIM OF RELIEF- 14<u>TH</u> AMENDMENT VIOLATION – VIOLATION OF DUE PROCESS, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, AND NEGLIGENCE AGAINST DEFENDANT DAVID GREENFIELD~~

~~Defendant David Greenfield made untrue statements that tainted the decisions of Judges, Prosecutors, Social Services, Family Court, Family Court Mediators and Policy makers.   Defendant Greenfield's creation of police Report #17-05506 (Exhibit D) was a violation of plaintiff's 14<u>th</u> Amendment rights, caused intentional emotional distress, physical distress and deprived the Plaintiff of his familial rights. The guarantee of due process of law violated by Defendants by falsifying documents, by contrast, is not as limited as it protects defendants during an entire criminal proceeding through and after trial. Pierce v. Gilchrist, 359 F.3d 1279, 1285-86 (10th Cir. 2004). The use of fraudulent evidence is a corruption of the "truth seeking" process of the trial court constituting an individual's rights.   See United States v. Agurs, 427 U.S. 97, 107 (1976) and Miller v. Paste, 386 U.S. 1 (1967) (finding that a deliberate misrepresentation of truth to a jury is a violation of an individual's rights); Caldwell v. Mississippi, 472 U.S. 320 (1985) (fining that an uncorrected, misleading statement~~

- 15 -

1   of law to a jury violated due process); ~~Darden v. Wainwright, 477 U.S. 168, 181-82 (1986) (improper~~

2   ~~argument and manipulation or misstatement of evidence violates the constitution). Cf. Mesarosh v.~~

3   ~~United States, 352 U.S. 1, 14 (1956). Whether as in the Seventh Circuit said in Petty, an allegation that~~

4   ~~"CPD" officers created evidence that they knew to be false" "is the hallmark of a fabrication case."~~

5   ~~Defendant's creation of "false" evidence –is the equivalent of fabricated evidence.~~

6   ~~On April 13, 2017 Defendant Greenfield was called by Stephanie Woolery in response to a~~

7   ~~violation of a Family Law Visitation agreement. Tamara Woolery (Plaintiff's Mother) and Stephanie~~

8   ~~Woolery had a dispute over the location and time of pick-up of Plaintiff's daughter. In report #17-05506~~

9   ~~Defendant David Greenfield (Exhibit F) falsely states,~~

10  **~~"It was discovered that John had attempted to hire a hit man to kill her."~~**

11  ~~This untrue, false statement has been used in family court case D16-00502 on 4 occasions in court,~~

12  ~~during family court mediation, child protective services and social services. Police Report #17-05506~~

13  ~~was used in family court on April 19, 2017, June 27, 2017, and January 19, 2018. Additionally it was~~

14  ~~used and referenced in a Social Services report June 9, 2017 and during Mediation on May, 5 2017 and~~

15  ~~June 9, 2017.~~

16  ~~In the case of Camper v. Minor, the court noted:~~

17
18  **~~A 'serious" or "severe" emotional injury occurs "where a reasonable person, normally constituted person, would be unable to adequately cope with the mental stress engendered by the circumstances of the case".~~**

19
20  ~~Furthermore the court has removed all limitations of damages in this area. In Leong v. Takaski, the court observed:~~

21
22  ~~"~~**~~Because other standards exist to test the authenticity of plaintiff's claim for relief, the requirement of resulting in physical injury, like the requirement of physical impact, should not stand as another artificial bar to recovery, but merely be admissible as evidence of the degree of mental and emotional distress suffered".~~**

23

24

25  ~~Defendants Greenfield's untrue false statements have caused the Plaintiff severe emotional trauma, pain~~

26  ~~and suffering. Additionally these actions have caused additional family court legal fees of over $9,500~~

27  ~~and has caused the Plaintiff ongoing depression and mental anguish that he still suffers today. Plaintiff~~

28  ~~was denied his familial rights and right to a fair trial in numerous family court cases due to the untrue~~

- 16 -

statements the Defendant made in police report#17-05506.

### D. 4TH CLAIM OF RELIEF- 14TH AMENDMENT VIOLATION – DELIBERATE INDIFFERENCE, CRUEL AND UNUSUAL PUNISHMENT- AGAINST DEFENDANT SCOTT SMITH

Where it is shown that an officer was deliberately indifferent to a serious medical need of a pretrial detainee, no further mens rea of the officer -- whether intent or motivation -- is necessary to state a substantive due process claim. See Cty. of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) (observing that deliberate indifference is "egregious enough" to satisfy the "conscience shocking" element required of substantive due process claims, where the officer exhibits deliberate indifference to the medical needs of a pretrial detainee) (citing City of Revere, 463 U.S. at 244). On February 10, 2017 at approximately 7:20pm Defendant Scott Smith took the Plaintiff's vehicle keys and would not let the plaintiff access his medications and personal items.  Plaintiff's vehicle was not seized, Plaintiff was not in custody and Defendant Smith's actions were completely unjustified. 3 City of Concord employees called Defendant Scott Smith to return Plaintiff's keys to him but Defendant Smith refused to respond. Amanda Jacobson called and Defendant Smith refused to return the keys and allow the Plaintiff access to his medications. Plaintiff waited by his vehicle for several hours in hopes Defendant Smith would return to allow the Plaintiff to access his wallet and medications. Plaintiff's wallet and medications were located in the Plaintiff's vehicle and it was imperative that the Plaintiff; take those medications. Plaintiff suffers from several life threatening medical complications and Defendant Scott Smith was notified that the Plaintiff needed to access his medications and wallet by 3 different individuals out of his vehicle and his keys to return home. Defendant Scott Smith ignored the calls and ignored Plaintiffs safety and intentionally restricted the Plaintiff from accessing his medications. Due to the depravation of the Plaintiff's medications the Plaintiff was found unresponsive by paramedics at approximately 10:30pm on February 10, 2017. Plaintiff spent 2 days on life support and 3 days in intensive care (Exhibit F) due to Defendant Smith's negligence.

It is clearly established that although officials may not be held liable for simple negligence, they may be held liable for "gross negligence" or "reckless disregard" for the safety of others. As the Supreme Court recently stated: "Among the historic liberties so protected was a right to be free from, and to

1
2

~~obtain judicial relief for unjustified intrusions on personal security." Ingraham v. Wright, 430 U.S. 651,~~
~~673, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1976).~~

3
4

**E. 5TH CLAIM FOR RELIEF- VIOLATION OF CALIFORNIA GOVERNMENT CODE § 845.6 FOR FAILURE TO SUMMON MEDICAL CARE BREACH OF DUTY OF CARE (GOV. CODE, § 845.6)**

5
6
7
8
9
10

In Plaintiff's Fifth cause of action in the SAC complaint the action is based on a statutory duty to Summon Medical care and Breach of Duty of Care.  Liability under Ca. Gov. Code section 845.6 is limited to serious and obvious medical conditions requiring immediate care. (Kinney v. Contra Costa County (1970) 8 Cal. App. 3d 761, 770 [87 Cal. Rptr. 638]. Section 845.6 requires that the public entity know or have "reason to know that the prisoner is in need of immediate medical care...." In Zeilman v. County of Kern, supra, the prisoner's medical problems were readily apparent.

11
12
13
14
15
16
17

On at minimum 7 occasions (see Exhibit B) while Plaintiff was incarcerated in MDF, Plaintiff requested medical help, to see a doctor, and complained of a medical emergency with no response from MDF personnel. Due to the lack of response Plaintiff's condition worsened and paramedics were summoned on September 9, 2017 and Plaintiff was admitted to Contra Costa County Hospital. During the 70 days of requests and pleas for medical assistance the Plaintiff experienced bleeding, lymph node swelling, floaters, cysts, accesses, blurred vision, headaches, chest pain, detached skin, lesions, vomiting, pain and a transient ischemic attack.

18
19
20

**F. 6TH CLAIM FOR RELIEF- U.S. CONSTITUTION 8TH AMENDMENT VIOLATION: MONNELL CLAIM- "ALL OR NONE" POLICY OF CONTRA COSTA COUNTY AGAINST DEFENDANT CONTRA COSTA COUNTY**

21
22
23
24
25
26
27
28

The policy of "take all medications or none" is a defunct unconstitutional policy that was enforced by MDF personnel over the course of 3 weeks against the Plaintiff.  While administering medications deputies observe while medical personnel provide medications to inmates per the MDF polices and procedure manual. Therefore, not only did the medical staff acquiesce to the "All or None" medication policy so did the Deputies on duty. This all or none policy was enforced by 3 medical professionals who refused providing the Plaintiff all of his medications and also 6 different on duty deputies. Moreover, the policy maker on staff on 3 occasions received written grievances in regards to this policy and failed to act or respond. The policy of "All or None" was one of the driving forces behind

- 18 -

the Plaintiff's 8th Amendment Violations of Cruel and Unusual punishment. In most circuits an entity is liable if a policymaker had constructive knowledge of the wrongdoing and failed to do anything about it.  One incident is generally not enough to give notice. Similarly, in Latuszkin v City of Chicago. See, e.g., Wright v. Town of Glenarden, 89 F.3d 831, at *3 (4th Cir. 1996) (stating that "[t]he plaintiff must show that responsible policymakers of the municipality had actual or constructive knowledge of the misconduct, but failed, as a matter of specific intent or deliberate indifference, to stop or correct the practices"). 91 Meck v. Ctr. for Health Care Servs., No. SA-05-C. However, on July 8th, July 9th, July 10th, and July 13th the Medical Director and Sheriff were both notified as he Plaintiff's protest to the "All or None" policy. However no action was taken because the "All or None" medication policy was a widespread pattern in MDF. In addition, Deputy Ball stated, "this is not Burger King, you can't have it your way!" The "All or None" medication policy forced the Plaintiff to take a medication the Plaintiff was allergic to and almost cost the Plaintiff his life.

It is further found that an Eighth Amendment claimant need not show that a prison official acted, or failed to act, believing that harm actually would befall an inmate; it is enough that the official acted, or failed to act, despite his knowledge of a substantial risk of serious harm. Farmer, 114 S. Ct. at 1981; see Hare, 74 F.3d at 648-50. It is clear that many of the Deputies are poorly trained and did not intentionally force the plaintiff to suffer but based on Farmer defendants failing to act with knowledge of the possibility of substantial risk is a violation of the 8th Amendment.  Furthermore, "intentionally refusing to respond to an inmate's complaints has been acknowledged as constituting deliberate indifference". [Gutierrez v. Peters, 111 F.3d 1364, 1366 (7th Cir. Ill. 1997)]. Plaintiff made requests to Deputies, Sergeants, Physicians, Nurses via the triage system, written grievances and verbally and no action was taken. The personnel intentionally chose to ignore the Plaintiff's suffering.   The Eighth Circuit Court of Appeals held that a prisoner's claim of being denied medication, or not given prescribed treatment, states a claim under the Eighth Amendment Willie Munn, Appellant, v. Rick Toney, Warden, Varner Unit, Adc; Gates, Security Guard, Varner Unit, Adc; Lt. Bass, Varner Unit, Adc, Appellees, 433 F.3d 1087 (8th Cir. 2006). The appellate court found similarly for Raymond King, King v. Busby, 162 Fed.Appx. 669 (8th Cir. 2006).

## H.  7TH CLAIM OF RELIEF - BANE ACT (CIV CODE, §52.1)– AGAINST DEFENDANT

- 19 -

**CONTRA COSTA COUNTY**

The Bane Act permits an individual to pursue a civil action for damages where another person 'interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of The United States, or of the rights secured by the Constitution or laws of this state.' 'The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., "threat, intimidation or coercion"), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law.' " (King v. State of California (2015) 242 Cal.App.4th 265, 294 [195 Cal.Rptr.3d 286). These terms are defined in Statue 52.1:

**[A] person or persons, whether or not acting under color of law, interferes by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state [.] Cal. Civ. Code § 52.1(a)-(b).**

See also Austin B. v. Escondido Union School Dist., 149 Cal. App. 4th 860, 883 (Ct. App. 2007) Plaintiff has the right to refuse any medication and has the right to adequate medical care. On July 8th, 9th and 10th and 12th of 2017 MDF staff threatened the Plaintiff that if he did not take the medication Lamictal he would not be given his other medications. In fact the personnel followed up on this threat and refused to provide the Plaintiff his other lifesaving medications (Exhibit C). This threat of "all or nothing" was a threat to Plaintiff's life and eventually caused the Plaintiff to be hospitalized on September 7, 2017. This threat by the MDF personnel was what coerced the Plaintiff into taking Lamictal which eventually caused the Plaintiff to suffer and now suffer from Kidney Dysfunction an irreversible diagnosis. As a sufferer of Stroke, Hypertension, Syncope, Obstructive Sleep Apnea, Pulmonary Emboli these medications were life threatening and prescribed by the Plaintiff's physicians. Plaintiff was threatened, the threats were followed up with action to deprive the Plaintiff his right for adequate medical care and the ability to refuse medications if he chooses. The threats continued on 3 consecutive days as indicated on Plaintiff's inmate request forms (Exhibit C). In fact even after notifying the deputies, and supervising medical staff no action was taken and the medications were still restricted on July 12, 2017. The test for whether a defendant violates a Section 52.1 for interference with legal

- 20 -

1
2
3
4
5
6
7
8
9

rights by threats, intimidation or coercion is whether a reasonable person, standing in the shoes of the plaintiffs, would have been intimidated, threatened or coerced by the actions of the defendants. (Richardson v. City of Antioch (2010) 722 F.Supp.2d 1188, 1147; Winarlov. Toshiba America Electronics Components, Inc. (9th Cir. 2001) 274 F.8d 1276, 1289-90.)   The Plaintiff had no choice but to abide by the Defendants threats or likely suffer from the effects of high blood pressure, hypertension, pulmonary emboli, high cholesterol, anxiety, depression, headaches, stroke and possibly death. Plaintiff previously before his incarceration was placed in the hospital on 3 occasions with complications from pulmonary emboli, stroke and high blood pressure over the past 24 months therefore, Plaintiff's fear for his life was founded.

10
11

I.   **8TH CLAIM OF RELIEF –BANE ACT (CIV CODE, §52.1) AGAINST DEFENDANT SCOTT SMITH**

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

~~The Bane Act does not extend to all ordinary tort actions because its provisions are limited to: threats, intimidation, or coercion that interfere with a constitutional or statutory right.  Defendant Scott Smith called the Plaintiff on October 30, 2017 at 10:53 am and on October 30, 2017 at 10:21 am and threatened the Plaintiff in an effort to force the Plaintiff to not file a Federal Civil Case against the Defendants. Scott Smith left 2 hostile threatening voice messages on the Plaintiff's cellular phone. The threats made by Defendant Scott Smith were made against the Plaintiff's life, his livelihood and his family. The threats made the Plaintiff fearful of his life and his family's life. Defendant Smith told the Plaintiff to not continue the pursuit and that the Defendant "would be watching him".  The Plaintiff has a right to pursue litigation and litigate against Civil Rights violations and the Defendant Scott Smith made an attempt through a threat of violence that if the Plaintiff executed his right the Plaintiff would suffer catastrophic harm and could possibly lose his life. Plaintiff's fear of Defendant Scott Smith is founded based on the Defendants actions on February 10, 2017 when the Defendant caused the Plaintiff to be hospitalize for 5 days and Defendant's actions on March 30, 2017 when the Defendant Scott Smith falsified court documents. Defendant Scott Smith has already acted on his threats of violence against the Plaintiff previously and has caused extreme emotional distress to the Plaintiff.~~

27
28

G.   ~~**9TH CLAIM OF RELIEF- 14TH AMENDMENT VIOLATION – VIOLATION OF DUE PROCESS, INTENTIONAL INFLICTION OF EMOTION DISTRESS, NEGLIGENCE**~~

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

**IN FAMILY COURT CASE D16-05002 AGAINST DEFENDANT DAVID GREENFIELD INCLUDING INTENTIONAL EMOTIONAL DISTRESS.**

Defendant David Greenfield made untrue statements that tainted the decisions of Judges, Prosecutors, Social Services, Family Court, Family Court Mediators and Policy makers. Defendant Greenfield's creation of police Report #17-05506 was a violation of plaintiff's 14th Amendment rights, caused intentional emotional distress, physical distress and deprived the Plaintiff of his familial rights. The guarantee of due process of law violated by Defendants by falsifying documents, by contrast, is not so limited as it protects defendants during an entire criminal proceeding through and after trial. Pierce v. Gilchrist, 359 F.3d 1279, 1285-86 (10th Cir. 2004). The use of fraudulent evidence is a corruption of the "truth seeking" process of the trial court constituting an individual's rights. See United States v. Agurs, 427 U.S. 97, 107 (1976) and Miller v. Paste, 386 U.S. 1 (1967) (finding that a deliberate misrepresentation of truth to a jury is a violation of an individual's rights; Caldwell v. Mississippi, 472 U.S. 320 (1985) (fining that an uncorrected, misleading statement of law to a jury violated due process); Darden v. Wainwright, 477 U.S. 168, 181-82 (1986) (improper argument and manipulation or misstatement of evidence violates the constitution). Cf. Mesarosh v. United States, 352 U.S. 1, 14 (1956). Whether as in the Seventh Circuit said in Petty, an allegation that "CPD" officers created evidence that they knew to be false" "is the hallmark of a fabrication case." Defendant's creation of "false" evidence –is the equivalent of fabricated evidence.

On April 13, 2017 Defendant Greenfield was called by Stephanie Woolery in response to a violation of a Family Law Visitation agreement. Tamara Woolery (Plaintiff's Mother) and Stephanie Woolery had a dispute over the location and time of pick-up of Plaintiff's daughter. In report #17-05506 Defendant David Greenfield (Exhibit F) falsely states,

**"It was discovered that John had attempted to hire a hit man to kill her."**

This untrue, false statement has been used in family court case D16-00502 on 4 occasions in court, during family court mediation, child protective services and social services. Police Report #17-05506 was used in family court on April 19, 2017, June 27, 2017, and January 19, 2018. Additionally it was used and referenced in a Social Services report June 9, 2017 and during Mediation on May, 5 2017 and June 9, 2017. In the case of Camper v. Minor, the court noted:

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

**A 'serious" or "severe" emotional injury occurs "where a reasonable person, normally constituted person, would be unable to adequately cope with the mental stress engendered by the circumstances of the case".**

Furthermore the court has removed all limitations of damages in this area. In Leong v. Takaski, the court observed:

"**Because other standards exist to test the authenticity of plaintiff's claim for relief, the requirement of resulting in physical injury, like the requirement of physical impact, should not stand as another artificial bar to recovery, but merely be admissible as evidence of the degree of mental and emotional distress suffered".**

Defendants Greenfield's untrue false statements have caused the Plaintiff severe emotional trauma, pain and suffering. Additionally these actions have caused additional family court legal fees of over $9,500 and has caused the Plaintiff ongoing depression and mental anguish that he still suffers today. Plaintiff was denied his familial rights and right to a fair trial in numerous family court cases due to the untrue statements the Defendant made in police report#17-05506 (Exhibit D).

**J. 10ᵀᴴ CLAIM OF RELIEF- MONNELL FAILURE TO ACT ON REPEATED CONSTITUTIONAL VIOLATIONS AGAINST GUY SWANGER**

Guy Swanger was notified on at least 5 occasions of the consistent ongoing constitutional violations within the Concord Police Department with no action. On February 13, 2017 Guy Swanger was made aware of the Defendants Scott Smith's violation of the Plaintiff's rights with no action, no discipline and no investigation. On April 3, 2017 Guy Swanger was notified of the untrue statements in the declaration created by Scott Smith with no action, no training and no discipline. On May 1, 2017 Guy Swanger was made aware of the untrue statements, the illegal search and untrue statements in Police Report #17-01290 and Police Report #17-05506 with no action, no investigation, no discipline and no training. On June 22, 2017 Guy Swanger was made aware of over 5 violations of citizen's rights in the complaint that was given to the City of Concord's Attorney's office with no action, no investigation and no training. On October 30, 2017 Guy Swanger was made aware of the threats to the Plaintiff with no action, no discipline and no investigation. See Fundiller v. Cooper City,' 777 F.2d 1436 (11th Cir. 1985) and similarly, in Chapman v. Pickett, the Seventh Circuit held that supervisors may be personally liable for failing to act when they have knowledge of a constitutional violations.

**REQUEST FOR RELIEF**

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

WHEREFORE, Plaintiff prays for a judgment in his favor as follows:

1. Issue a judgment declaring that the acts of the Defendants described herein violate the 8th Amendment to the United States Constitution, Bane Act (Civ. Code, §52.1), Breach of Duty of Care (Gov. Code, § 845.6) California, Government Code § 845.6 for Failure to Summon Medical Care, U.S. 14th Amendment Violation, Intentional Infliction of Emotional Distress and Violation of 42 U.S.C. § 1983.

2. Punitive damages in addition to actual damages because Defendants' conduct was reckless with callous disregard and indifference to Plaintiff's rights and safety to others.

3. Prejudgment interest.

4. Exemplary damages, against each individual Defendant, as out in each cause of action, in an amount sufficient to deter and to make an example of those defendants.

5. Issue an injunction ordering Defendants to stop engaging in such unconstitutional and unlawful acts, and to develop policies and procedures for preventing the recurrence of any such unconstitutional and unlawful acts.

6. For special damages including back pay and front pay, benefits and consequential damages.

7. For reasonable fees and expense of litigation as provided for in 42 U.S.C. § 1983

8. Damages for ongoing medical care.

9. For costs of suit and attorney's fees.

10. For such other and further relief as the Court may deem just, proper, and appropriate.

**H.** **<u>REQUEST JURY TRIAL ON ALL ISSUES</u>**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure and Rule 38-1 of the Local Rules, Plaintiff demands trial by jury for all the issues pleaded herein so triable.

By: _____/S/_____

Date:  April 4, 2018                              John Woolery, Plaintiff Pro Per

- 24 -

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit A

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

**DECLARATION IN SUPPORT OF: MOTION TO INCREASE BAIL and/or**
**MOTION TO DENY RELEASE**
(1269c P.C. and 1275.1 P.C.)

F I L E D
MAR 30 2017

Detective Scott Smith _____, under penalty of perjury, says that I am
                (Name Of Officer)
a peace officer employed by the Concord Police Department _____ and that
                              (Department Or Agency)
John Damon Woolery (11/4/1972) __ 1) x __ was arrested without an arrest warrant
         (Name of Defendant )        2)___will be arrested upon a warrant to be issued
for the commission of the following crime(s):

___   Misdemeanor violation of domestic violence restraining order
_X_   The following felony offense(s): List here the offenses by names and code section.

      646.9 PC - Stalking

_X_   I have reason to believe that the amount of bail on the Bail Schedule is insuffi-
      cient for the specific reasons cited below.  (The Penal Code requires the judge or
      magistrate to consider the following factors when setting, reducing or denying
      bail: (1) the probability the defendant will make required court appearances; (2)
      the protection of the public, which §1275 says shall be the primary factor; (3) the
      seriousness of the offense charged, including alleged injury to the victim, and al-
      leged threats to the victim or a witness to the crime charged, the alleged use of a
      firearm or other deadly weapon in the commission of the crime charged, and the
      alleged use or possession of controlled substances by the defendant; (4) the
      previous criminal record of the defendant; and (5) in domestic violence cases, the
      need to assure protection of the victim or a member of the victim's family.)

      List bail factors here:
      On 2/10/17 the Defendant, John Woolery, was arrested for stalking his estranged
      wife, Stephanie Woolery since 1/5/17. The Defendant is accused of stalking
      Stephanie Woolery by sending her text messages, emails, and leaving strange
      items outside her door (bottles of alcohol, used condoms, etc).  He did all of
      these things surreptitiously, so Stephanie did not know who was stalking her.
      The investigation revealed that John posted fraudulent craigslist personal adver-
      tisements soliciting men to call/text her for sex (confirmed via computer forensic
      analysis and John's admission).  These Craigslist advertisements provided
      Stephanie Woolery's personal cell phone number. These advertisements were
      placed under personals, missed connections, and casual encounters. All adver-
      tisements were sexual in nature and solicited unknown men to contact Mrs.
      Woolery, send her photos, and follow her. These advertisements were placed
      with the intent to "fuck with" Mrs. Woolery. John Woolery specifically told me that
      he intended to solicit strange men to follow and harass her.

      He also sent several emails from fake email addresses that talked about him fol-
      lowing her and her daughter (confirmed via IP address).  One email included
      photographs taken of the victim's vehicle and her daughter's school to prove he

1

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

was following her. As a part of the investigation, John's computer and smart phones were seized and searched. A forensic analysis of the electronics showed recent Internet search histories which included topics such as:

      get someone arrested
      murder for hire
      how to find a hitman on craigslist
      cost to hire a hitman
      find kidnappers in your area
      how do I hide my IP address
      block IP address iPhone
      wash DNA from paper
      how to permanently delete cell phone records
      delete those incriminating texts permanently
      wipe cell phone
      stephanie woolery's personal information including address
      how to make a bomb
      how to ruin your ex's new relationship
      sycamore apartments concord (Victim's address)
      when is a stalker threat

During an interview, John Woolery admitted to me that he is bi-polar and has homicidal hallucinations, delusions of grandeur, depression, and that he suffers from panic attacks.

Based on these facts, I believe John had already or was in the process of planning to have Stephanie murdered or kidnapped. I believe if he is allowed bail, he will continue his plan to murder or kidnap Stephanie placing her life, and that of their 13 year old daughter, in jeopardy.

_____ I have probable cause to believe that the source of any monies or other financial consideration that may be offered for the defendant's bail is possessed, or was received or obtained through an unlawful act, transaction or occurrence constituting a felony (1275.1(k) P.C.). The following facts support this belief:

I therefore ask that the Magistrate or Judge set bail in an amount greater than the amount set forth on the Contra Costa County Felony Bail schedule. (1269c P.C.).

If probable cause is cited above, I request that the Magistrate or Judge order that no consideration, pledge, security, deposit, or indemnification paid, given, made, or promised for the defendant's release be accepted, and that his release on bail be prohibited, unless and until the defendant shows that no part of any consideration, pledge, security, deposit, or indemnification paid, given, made, or promised for its execution was obtained by felonious means. (1271.1 P.C.)

I declare under penalty of perjury that the foregoing is true and correct except as to those matters stated on information and belief, and as to those matters I believe them to be true and correct.

2

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

# Exhibit B

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK





CONTRA COSTA REGIONAL Woolery, John Damon
MEDICAL CENTER          MRN: 300225518, DOB: 11/4/1972, Sex: M
2500 Alhambra Ave       Adm: 9/7/2017, D/C: 9/8/2017
MARTINEZ CA 94553
Cont Care -IP

**ED Notes (continued)**

**ED Provider Notes by Bridget Dyer, MD at 9/7/2017 12:16 PM (continued)**

HEART: Borderline tachycardic. No murmurs. A +2, +2 radial pulses.
ABDOMEN: Soft. Nontender to palpation. No rebound or guarding. No HSM although limited exam secondary to habitus.
MUSCULOSKELETAL: No swelling in the lower extremities.
SKIN: Notable for this papular rash with almost a follicular appearance with erythema, excoriations on arms with appearance almost of dyshidrotic eczema on hands. There are 1 or 2 lesions on palms. Soles are spared and the feet seem to be relatively spared. Otherwise, rashes on the chest, abdomen, back, neck, face, ears all the way down. Patient has impressive lymphadenopathy, axillary and groin as well.

MEDICAL DECISION MAKING: Differential diagnosis is broad but includes infectious process. Consider possibility of HIV or serum sickness secondary to hepatitis B or C. Acute HIV is a consideration because of rash, pharyngitis, and fever although patient has no real risk factors for seroconversion. Considered drug reaction. When directly asked, patient turns out to have been taking Lamictal. He was started on the Lamictal in July in MDF. As soon as he got the rash, he did stop taking the Lamictal because he had been told by his provider that if he got a rash, he should stop. He did not think it was possibly the cause of the rash because he stopped it so long ago. Considered strep. Patient reports that the nurses had him swab his own throat _____ was negative. Considered EBV. Monospot negative but only 5 days into sore throat and does not really explain the rash. Considered a possibility of 2 different discreet kinds of rash, the first rash started being perhaps eczema and the second rash being more generalized process associated with sore throat and fever, etcetera. Discussed the case with MOD Stuart Forman, colleagues, and eventually with Dr. Oliver Graham who was kind enough to examine the patient and consider the possibility of DRESS secondary to Lamictal. Patient's laboratories are positive for an eosinophilia yesterday that is worsening today with eosinophils of 8.3%. A creatinine of 1.3 which is up from yesterday but actually not far from patient's baseline so possible problem. A CK that was elevated at 245 with urine myoglobin seen. Urinalysis negative for proteinuria. Patient has no pulmonary or cardiovascular complaints at this time so no chest x-ray was ordered. Patient was treated in the emergency department initially with IV Benadryl and 10 mg of Decadron for itching and presumed allergic rash. He unfortunately had worsening pruritus on this regimen. He was given an additional 25 mg of Benadryl and was started on famotidine IV with some minimal improvement. I discussed the case with Dr. Forman to consider a 1 day admission to get symptoms under control and consider appropriate treatment plan for patient. Also to check and make sure that given that patient has worsened gradually and is now febrile and actively worse with a slightly worsening creatinine, that patient be watched for in need for further supportive care. Patient was admitted in guarded condition with a diagnosis of DRESS syndrome. At time of this dictation, patient's HIV viral load did not return.

223361
**Allergies:**
Allergies
Allergen                          Reactions
  • Lamictal [Lamotrigine]
     *dress*
  • Food - Custom                  Rash
     *Pt. Reports a rash when excessive amounts of pineapple are eaten. All other citrus OK*

**Home Medications:**
Prior to Admission medications
Medication                                          Sig
albuterol (PROVENTIL HFA;VENTOLIN HFA) 90 mcg/actuation   Inhale 2 puffs into the lungs every 4 (four) hours as needed
inhaler
amLODIPine (NORVASC) 5 MG tablet                    Take 5 mg by mouth daily Indications: HYPERTENSION
aspirin 81 MG EC tablet                            Take 81 mg by mouth daily
atenolol (TENORMIN) 25 MG tablet                   Take 25 mg by mouth daily Indications: HYPERTENSION

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

# Exhibit C

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CONTRA COSTA COUNTY
## DETENTION FACILITY

(  ) INMATE REQUEST FOR INFORMATION     ( ✓ ) MEDICAL REQUEST

To: DOCTOR/MEDICAL NURSES

From: JOHN WOOLERY        Bkg # F7/CCTP

Date: 7 / 13 / 17      Housing Assignment: F7

Check One:     (  ) Request   ( ✓ ) Grievance   (  ) Appeal   (  ) Other

Request: DENIED MEDICATION AGAIN BECAUSE I REFUSED 1 MEDICATION I SPOKE TO DOCTOR 7/12/17 AND SHE ADJUSTED MEDICATIONS AND YET NURSE TODAY WITH PURPLE PANTS AND A TERRIBLE ATTITUDE TOLD ME ALL OR NOTHING. I NEED MY BP MEDS AND THIS IS HER 3rd TIME SHE HAS DONE THIS TIME WAS ABO 9 30AM. THIS INCONSISTENT MEDICATIONS IS BAD FOR MY HEALTH

Date Rec'd: 7 / 13 / 17   Rec'd By: BALL

Routed To: _____

ANSWER:     (  ) APPROVED     (  ) DENIED-(state reason)
You were seen by the triage nurse today. You need to attend to pill calls so you can take your meds on time.

By: _____ Pemiaku, RN _____   Date: 7 / 15 / 17

Pink: Kept by Inmate        Yellow: Reply to Inmate        White: To Booking
DET 024: FRM 1/2/91

- 31 -

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

## CONTRA COSTA COUNTY
## DETENTION FACILITY

( ) INMATE REQUEST FOR INFORMATION      (✓) MEDICAL REQUEST

To: _Doctor Ryse_

From: _John Woolery_      Bkg # _CC17JL11_

Date: _7_ / _8_ / _17_ (DOB)  Housing Assignment: _F7_

Check One:   (✓) Request   ( ) Grievance   ( ) Appeal   ( ) Other

Request: _Need Ryse med adjustment_
_ASAP_
_-need sterile water for_
_CPAP - 2 bottles per day_

Date Rec'd: _7/8/17_   Rec'd By: _Boutaii✓_

Routed To: _____

ANSWER:      ( ) APPROVED      ( ) DENIED-(state reason)

USE PHONE TRIAGE SYSTEM
TO ACCESS MEDICAL

By: _____   Date: _____/_____/_____

Pink: Kept by Inmate          Yellow: Reply to Inmate          White: To Booking
DET 024: FRM 1/2/91

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

# CONTRA COSTA COUNTY
## DETENTION FACILITY

( ) INMATE REQUEST FOR INFORMATION    ( ) MEDICAL REQUEST

To: Mental Health

From: JOHN WOOLERY    Bkg # CC175I511

Date: 8 / 3 / 17    (DOB)    Housing Assignment: _____

Check One:    ( ) Request    ( ) Grievance    ( ) Appeal    ( ) Other

Request: _____

Need PSYC med ADJUSTMENT
CYCLING DOWN and UP
THIRD REQUEST
REQUESTED 7/26 and 7/8

IF more info needed
PLT CONTACT PSYC DR
KRIST + MICHAEL JOHN MUIR

Date Rec'd: 8 / 7 / 17    Rec'd By: SCHWAAB

Routed To: _____

**ANSWER:**    ( ) APPROVED    ( ) DENIED-(state reason)

Scheduled

By: Victoria Lu    Date: 8/3/17

Pink: Kept by Inmate        Yellow: Reply to Inmate        White: To Booking
DET 024: FRM 1/2/91

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit D

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

CONCORD POLICE DEPARTMENT

## OFFENSE REPORT

CR #   17-05506

Page 2 of 2

On Wednesday, April 12, 2017, at approximately 1512 hours, (V) Stephanie Woolery called CPD to report her ex-husband, (S) John Woolery, violated the above listed restraining order. She told dispatch she was at their daughter's school, King's Valley Christian School, to pick her up and John was also there in the parking lot. She went on to say that John is supposed to have supervised visits on Wednesday's, but he told her he was not going to show up. Stephanie requested a phone call to talk about the incident.

I called and spoke to Stephanie and she told me the following:

Stephanie said on March 29, 2017, John's attorney emailed her attorney advising John was going to give up his visitation for April 12, 2017, because he had a doctor appointment. Due to that, Stephanie had to take off work so she could pick their daughter (Jordan Woolery) up from school. She continued to tell me that John's attorney emailed again on April 11, 2017 stating that John had rescheduled his doctor appointment and will be able to exercise his visit with their daughter. Stephanie already took the day off work and since all visitations must be supervised, with such a short notice, she was not able to set up the supervised visit. Her concern is the person listed as being the supervisor during John's visits with their daughter. I asked Stephanie to explain to me who gets to supervise the visits; she said her cousin is the only person. Stephanie was given the power to determine who had the right to supervise and her cousin is the person she listed. Stephanie's attorney responded to John's attorney on April 11, 2017, telling him John's visit was not going to happen on April 12, 2017.

Today, when Stephanie pulled into the parking lot of 4255 Clayton Rd. (King's Valley Christian School), she was shocked to see John there with his mother. Stephanie said at one point they were about 20 yards away from each other. She admitted that once she parked her car, John's mother exited the passenger seat and John drove out of the parking lot. Her concern is that John was made aware that the visit was not going to take place today. John had no reason to be there because he knew she was the one who was going to pick their daughter up. Stephanie continued to tell me that John would have somehow taken their daughter out of school, he would have been in violation because it would not have been a supervised visit and also she would not have known where to pick their daughter up from since there is no contact allowed between she and John.

Stephanie told me the history between John and her is complicated and that she is fearful of him. I did not have her elaborate too much on her past with John, but I learned that after she and John were divorced, it was discovered that John had attempted to hire a hit man to kill her. She advised me that Detective Scott Smith is assigned that case and she sent him an email today to keep him in the loop. She also emailed her attorney.

Stephanie told me her cousin can confirm that John was made aware he was not to have a visit today and that Stephanie was going to be the one picking her up from school. She told me her cousin also told John this information in person.

I did not make contact with John.

Refer to Detective Smith in MCU.

End of report.

| PORTING OFFICER & I.D.# | BEAT | DATE AND TIME WRITTEN | | SUPERVISOR APPROVING | | TYPIST | DATE AND TIME TYPED |
|---|---|---|---|---|---|---|---|
| REENFIELD #0492 | 5 | 04/13/17 | 00:14 | 0301 | PRICE | 0492 | |

RptVer 20170504094359

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

# Exhibit E

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

# Introduction / Executive Summary

## Introduction

This 2015 Jail Needs Assessment (JNA) for the Contra Costa County Adult Detention System was developed to comply with California Code of Regulations (CCR) Title 24, Sec. 13-102(c) 2. Projections are based on updated county population and resident profile information current through 2014 and 2015. The report includes a summary of 2019/2020 bed capacity requirements and outlines the proposed phased development of the West County Detention Facility site to meet the County's detention system needs as part of long term strategic plan.

Contra Costa County proposes to construct a new adult detention facility at the West County Detention Facility to provide 416 high security beds, a dedicated behavioral health housing unit, a child/parent contact visitation center, a workforce readiness center, a rehabilitative service center, academic classrooms, and administrative and staff support spaces to meet both current and future needs of the Contra Costa County Adult Detention System.

08.28.2015

## Executive Summary

Over the years, Contra Costa County and the Office of the Sheriff have been active and effective in managing the County's criminal justice and detention systems to reduce the number of people held in custody. The effect of these efforts is reflected in the County's low per capita incarceration rate, at 33% below the state average.

Despite the County's best efforts, however, including the use of alternatives to detention programs and the implementation of a pilot Pretrial Services program, the detention system has struggled to keep pace with County population growth, coupled with the rapid increase in statewide incarceration rates over the past 30 years.[1]

Informed by detailed data and analysis, this JNA makes a number of recommendations to enhance the operations and beneficial effects of the County detention system, strengthen programming to improve reentry success, and reduce recidivism to increase public safety. The centerpiece of the plan is the creation of a new reentry, treatment, and housing facility to be located within the secure perimeter of the existing West County Detention Facility (WCDF).

Providing 416 replacement high-security beds, the proposed West County Reentry, Treatment, and Housing Facility (WRTH) will allow the County to depopulate the aging and overcrowded Martinez Detention Facility (MDF), increasing its safe and effective operations consistent with its original direct supervision design. WRTH includes the construction of a Reentry Services Complex to house reentry and workforce readiness services, behavioral health services, and child/ parent contact visitation services. All people housed in either new or existing housing units at WCDF will have access to a robust array of programming and services currently unavailable at WCDF or MDF due to serious space, design, and capacity limitations.

[1] Between 1984 and 2014, the County's population has increased by 56.9%, rising from 698,814 to 1,096,637.



SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

HDR

02

08.28.2015

## System-Related Findings:

- Assuming that the detention system capacity needs will track County population growth, it is anticipated that the detention system's capacity needs will be 1,926 beds by 2019; 2,042 beds by 2025; and 2,137 beds by 2030.

- Despite statewide and national growth in rates of incarceration, the County's average daily population (ADP) numbers have been relatively flat over the past 10 years; however, the jail system sorely lacks high-security housing capacity, resulting in serious overcrowding at MDF.

- The impact of AB109 on the total number of residents in the detention system has been modest. Because the County has historically sent relatively small numbers of people to serve their sentences in state prison, relatively small numbers of people have been returned to County control since the advent of AB109.

- However, a meaningful but unknowable percentage of the unsentenced population detained in the County's jail system at any given moment may eventually be sentenced under AB109 provisions, which would then require them to serve their custodial term in the County jail system rather than in state prison.

- The detention system lacks a Jail Management System (JMS) capable of supporting real-time, accurate, and comprehensive data analysis for use in classification decisions, service delivery, program participation, or participant progress. A modern, HIPAA-compliant JMS would substantially improve daily management, data analysis, and outcome evaluations.

- Constructing 416 high-security beds at the WRTH will mitigate pressing custodial deficiencies at the Martinez Detention Facility, substantially reducing MDF's overcrowded, compacted, and unsafe conditions.

## Population-Related Findings:

- The County's jail incarceration rate of 143 (per 100,000 population) in 2014 was 33% lower than the state's incarceration rate of 214 (per 100,000 population).

- The JNA's snapshot analysis revealed that the Sheriff's Alternative to Detention programs, along with the County's Pretrial Services Program, reduced the jail system's average daily population (ADP) by 661 people.

- The County's comparatively low incarceration rate, as indicated above, suggests that the County is more effective than state averages at pretrial-releasing or cite-releasing people who have been charged with relatively minor offenses, allowing them to remain out of custody until their case is heard. Correspondingly, people who are not released from the County jail system (whether pretrial or sentenced) are, on average, those charged with or convicted of relatively serious offenses.

- This finding is consistent with the jail system's relatively long Average Length of Stay in custody (ALOS), at 181 days. Given that many people (both pretrial or sentenced) are released on various detention-alternative programs, it is to be expected that people who remain in custody on relatively serious charges are likely to have longer ALOS in detention.

- Thirty-six percent of people held in the jail system were on probation or parole when they were returned to custody. While not uncommon in many jurisdictions, this statistic highlights the need for a strong continuum of program and services both while in custody and in community.

## Findings Specific to Martinez Detention Facility:

- MDF's original facility design and operational philosophy have been severely compromised in the past 30 years, due in large part to the fact that its BSCC-rated capacity has nearly been nearly doubled since its original rating in 1981.

- With its current double-bunked operations, MDF is chronically operating above functional capacity and often experiences population peaks above its current rated capacity.

- Though originally designed as a medium-security facility, MDF has come to serve as the County's only high-security facility as well as the behavioral health facility, neither of which is consistent with its original intent as a medium-security facility designed to house people for short terms, usually during their Court proceedings.

- Because MDF was not designed to provide long-term housing and thus lacks any meaningful program spaces, MDF's physical infrastructure enables the provision of essentially no programs or therapeutic services to the very populations that could most benefit from these resources.

- Because MDF's current rated-capacity is nearly double the number for which it was designed, people incarcerated at MDF experience extremely long periods of confinement in their cells, which is inconsistent with either safety or rehabilitation.

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

# Recommendations

1. Move people with behavioral health needs out of MDF and into new and appropriate housing.

   *Current housing conditions and lack of access to rehabilitative programs and therapeutic services exacerbate behavioral health issues and are inconsistent with recovery and successful reentry.*

2. Depopulate MDF to improve resident behavioral management and safety and security.

   *When built, MDF was a state-of-the-art direct supervision facility in both physical plant and operational philosophy. However, because the increases in its BSCC-rated capacity in the last 30 years have led to chronic double-bunking and overcrowding, the tenets of direct supervision cannot be maintained, compromising the safety and security of residents and staff, as demonstrated by high rates of assaults at the facility.*

   *Returning the housing unit capacities to 48 beds as originally designed will improve safety and security at MDF. In addition, reducing the overcrowded conditions will improve enhance the effectiveness of any new programming introduced at the facility.*

3. Increase the availability of programs that enhance reintegration back into the community and reduce recidivism.

   *After enhancements in programming and JMS, develop metrics to measure success and identify areas in need of improvement. In particular, measure the recidivism rates of people who have been returned to custody, including those returned while on probation or parole.*

   *Approximately 36% of people in the Contra Costa detention system were under judicial supervision at the time of their return to custody. On the surface, this suggests large gaps or weaknesses in the continuum of reentry and reintegration programming, both in custody and in community.*

   *Reducing the number of people on probation or parole when returned to jail should be a high priority. This group, while still under judicial supervision, could be targeted for in-custody and post-incarceration programming to enhance their rates of success.*

4. Enhance programming opportunities for 18-24 year olds.

   *Of the various age cohorts, this group is the largest within the Contra Costa jail system. Providing a continuum of appropriate services in-custody, during transition, and during reintegration is consistent with best practices recognized nationally. Reducing the number of young adults in the system can support long-term recidivism reduction.*

5. Following the development and implementation of a robust and integrated Jail Management System (JMS), modify the intake process to solicit more information, including:

   • Prior arrests
   • Parental status
   • Ages of children, if any
   • Housing status (prior to arrest)
   • Employment status (prior to arrest)
   • Behavioral health status
   • Family involvement in the Child Welfare system
   • Status of enrollment in healthcare
   • Contact information for family member or other personal support

   *A good JMS is worth its weight in gold, providing useable data for analysis to guide operations, improve policies, and inform new initiatives. The current JMS can produce only extremely limited data reports and does not appropriately integrate information provided by the various departments that operate inside the detention system.*

   *In developing this JNA, nearly all of the data related to demographics and composition of the population currently incarcerated in the jail required manual aggregation – an extremely time-consuming and inefficient process.*

   *A data system that allows for real-time data collection, output, and analysis, designed to comply with all state and federal privacy laws, would allow the Sheriff's Office to be more nimble and responsive to the needs of the detention population.*

- 39 -

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

# Exhibit F

**DECLARATION IN SUPPORT OF: MOTION TO INCREASE BAIL and/or**
**MOTION TO DENY RELEASE**
(1269c P.C. and 1275.1 P.C.)

<u>Detective Scott Smith</u>_____, under penalty of perjury, says that I am
(Name Of Officer)
a peace officer employed by the <u>Concord Police Department</u>_____ and that
(Department Or Agency)
<u>John Damon Woolery (11/4/1972)</u>___1)_x__was arrested without an arrest warrant
(Name of Defendant )                   2)____will be arrested upon a warrant to be issued
for the commission of the following crime(s):

___  Misdemeanor violation of domestic violence restraining order
_X_  The following felony offense(s): List here the offenses by names and code section.

646.9 PC - Stalking

_X_  I have reason to believe that the amount of bail on the Bail Schedule is insuffi-
cient for the specific reasons cited below. (The Penal Code requires the judge or magistrate
to consider the following factors when setting, reducing or denying bail: (1) the probability the defendant will
make required court appearances; (2) the protection of the public, which §1275 says shall be the primary
factor; (3) the seriousness of the offense charged, including alleged injury to the victim, and alleged threats
to the victim or a witness to the crime charged, the alleged use of a firearm or other deadly weapon in the
commission of the crime charged, and the alleged use or possession of controlled substances by the de-
fendant; (4) the previous criminal record of the defendant; and (5) in domestic violence cases, the need to
assure protection of the victim or a member of the victim's family.)

List bail factors here:
On 2/10/17 the Defendant, John Woolery, was arrested for stalking his estranged
wife, Stephanie Woolery since 1/5/17. The Defendant is accused of stalking
Stephanie Woolery by sending her text messages, emails, and leaving strange
items outside her door (bottles of alcohol, used condoms, etc). He did all of
these things seriptitiously, so Stephanie did not know who was stalking her. The
investigation revealed that John posted fraudulent craigslist personal advertise-
ments soliciting men to call/text her for sex (confirmed via computer forensic
analysis and John's admission). He also sent several emails from fake email ad-
dresses that talked about him following her and her daughter (confirmed via IP
address). One email included photographs taken of the victim's vehicle and her
daughter's school to prove he was following her. As a part of the investigation,
John's computer and smart phones were seized and searched. A forensic anal-
ysis of the electronics showed recent Internet search histories which included
topics such as:

get someone arrested
murder for hire
how to find a hitman on craigslist
cost to hire a hitman
find kidnappers in your area
how do I hide my IP address
block IP address iPhone

1

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK

wash DNA from paper
how to permanently delete cell phone records
delete those incriminating texts permanently
wipe cell phone
stephanie woolery's personal information including address
how to make a bomb
murder for hire

Based on these facts, I believe John had already or was in the process of planning to have Stephanie murdered or kidnapped. I believe if he is allowed bail, he will continue his plan to murder or kidnap Stephanie placing her life, and that of their 13 year old daughter, in jeopardy.

_____ I have probable cause to believe that the source of any monies or other financial consideration that may be offered for the defendant's bail is possessed, or was received or obtained through an unlawful act, transaction or occurrence constituting a felony (1275.1(k) P.C.). The following facts support this belief:

I therefore ask that the Magistrate or Judge set bail in an amount greater than the amount set forth on the Contra Costa County Felony Bail schedule. (1269c P.C.).

If probable cause is cited above, I request that the Magistrate or Judge order that no consideration, pledge, security, deposit, or indemnification paid, given, made, or promised for the defendant's release be accepted, and that his release on bail be prohibited, unless and until the defendant shows that no part of any consideration, pledge, security, deposit, or indemnification paid, given, made, or promised for its execution was obtained by felonious means.  (1271.1 P.C.)

I declare under penalty of perjury that the foregoing is true and correct except as to those matters stated on information and belief, and as to those matters I believe them to be true and correct.

Dated _____ at _____ California

_____
Declarant

## ORDER

Good cause having been shown by declaration, IT IS ORDERED that the defendant

John Damon Woolery_____ be admitted to bail in the sum of $ _____.
(Name of Defendant )

2

SECOND AMENDED COMPLAINT WOOLERY V. CITY OF CONCORD ET, AL. – Case No. 3:17-cv-06786-SK